IN THE CIRCUIT COURT OF THE
TWENTIETH JUDICIAL CIRCUIT, IN
AND FOR CHARLOTTE COUNTY,
FLORIDA

CASE NO.: 17000925CA

SUMMER TILLMAN,

      Plaintiff,

vs.

UBER TECHNOLOGIES, INC., and
PICH ALLAN MICHAELS,

      Defendants.

2:17-Cv-681-FtM-38CM

_____/

## COMPLAINT

Plaintiff, SUMMER TILLMAN (hereinafter, "Plaintiff"), by and through the undersigned counsel, hereby sues Defendants, UBER TECHNOLOGIES, INC. ("UBER") and PICH ALLAN MICHAELS ("MICHAELS"), and alleges as follows:

### INTRODUCTION

1.     This action arises out of an incident that occurred on March 30, 2016. On that evening, Plaintiff was forcibly touched and kissed by UBER employee MICHAELS. Plaintiff is among over two-hundred (200) other female victims who had been battered and/or raped by UBER drivers.

2.     Plaintiff alleges that UBER, as a transportation company and common carrier, is directly liable for its negligent hiring, retention, and supervision of MICHAELS, and vicariously liable for MICHAELS' tortious conduct against Plaintiff.

3.     Since its founding in 2009, UBER has grown rapidly into a multi-billion-dollar enterprise with operations worldwide. Forbes[1] and the Wall Street Journal[2] have

both ranked UBER has the world's most valuable private, global technology company. However, UBER's phenomenal growth is due at least in part to the ease with which it takes on new drivers in any given market, which, unfortunately, is accomplished in part by lax hiring and security screening procedures. At the same time, UBER has marketed itself as a safer, better alternative to other methods of transportation.

4.      UBER's conduct evinces a conscious attitude and corporate policy of "profits over people," characterized by a willful and knowing disregard for the rights and safety of others, especially female passengers.

## PARTIES

### Plaintiff

5.      Plaintiff is an adult woman who is a Florida resident and who was full-time student during the time period when the subject incident transpired. Plaintiff only began using UBER after becoming persuaded that UBER was a safe, high-quality car service. She gained this impression from UBER advertising, and from her own personal experience taking UBER rides with friends who already had UBER's digital smartphone application, or "app". She rode in UBER cars and was impressed by the deliberate appearance that UBER had cultivated with its high-end, new-model, clean vehicles operated by professional UBER drivers. Plaintiff relied upon UBER's marketing regarding safety, professionalism, and reliability in choosing to ride with UBER on a repeat basis.

---

[1] Zack Friedman, *These 197 Tech Companies Are the World's Most Valuable Unicorns*, Forbes (May 30, 2017), https://www.forbes.com/sites/zackfriedman/2017/05/30/tech-unicorns/#7d7838581179

[2] Scott Austin, et al., *The Billion Dollar Startup Club*, The Wall Street Journal (Feb. 18, 2015), http://graphics.wsj.com/billion-dollar-club/

UBER

6.      UBER is a Delaware corporation with its principal place of business at 1455 Market Street, Fourth Floor, San Francisco, California 94103.

7.      UBER is a popular and rapidly expanding ride-hailing company whose app allows people to order and pay for transportation through their smartphones, as an alternative to traditional taxi cabs. Since its founding, UBER has grown to operate in · more than 700 cities worldwide.[3] In October 2016, UBER's CEO indicated that the company provides its services to over 40 million active riders monthly. According to a June 2016 valuation, UBER was worth $68 billion.

8.      When a prospective rider initiates a transportation request through UBER's app, UBER matches the rider with an UBER driver based upon a number of specifications, such as the tier of service requested, number of passengers, and geographical proximity of the rider to nearby drivers. UBER chooses what information to provide to the drivers and when to provide it. UBER typically does not disclose the rider's destination to the driver until the driver accepts the pickup request.

9.      To provide rides quickly and efficiently, UBER's business model requires a large pool of drivers. To accomplish this, UBER solicits and retains hundreds of thousands of non-professional drivers. There are no apparent specialized skills needed to drive for UBER. In order to become a driver for UBER, applicants apply through UBER's website. The application process is entirely online and involves filling out a few short forms and uploading photos of a driver's license, vehicle registration, and proof of insurance. UBER does not adequately verify that the documents submitted are accurate or

---

[3] https://www.uber.com/cities/

actually pertain to the applicant. Unlike traditional taxicab and limousine services, UBER refuses to require fingerprinting or adequate law enforcement background checks for its drivers.

10.     To encourage its drivers to remain employees and to steer them away from joining competitors, UBER at times incentivizes them with guaranteed cash, tantamount to a salary, if a certain number of rides are completed in a given time frame, if they make certain trips within a specified hotspots during specified times or if they complete an "uberX" or "uberPOOL" trip.

11.     UBER does not require driver applicants to attend sexual harassment prevention and awareness training classes.

12.     UBER is and has been aware that its security screening processes are insufficient to prevent incompetent and/or dangerous applicants from successfully registering as UBER drivers. Nevertheless, UBER promises and advertises on its website, "[f]rom start to finish, a ride you can trust." The words "safe" and "safety"—as in "safe rides," "safe pickups," and "trip safety – our commitment to riders"—appear repeatedly on its website.

13.     Upon information and belief, UBER lobbies state and local governments to limit regulations, including allowing UBER to conduct its own background checks of driver applicants instead of having municipalities perform the more stringent security screening applied to traditional taxi drivers.

14.     Upon information and belief, UBER does not perform its own background checks. Rather, UBER generally outsources background checks of driver applicants to third-party vendors that do not perform stringent background checks and limit searches to

information available online. The background checks run potential drivers' Social Security numbers through databases similar to those held by private credit agencies, which only go back for a period of seven years and do not capture all arrests and/or convictions. Neither UBER nor the third-party vendors it uses for background checks properly verifies that the information provided by applicants is accurate or complete. The turnaround time for an UBER background check may be under 36 hours.

15.     The application process to become an UBER driver is simple, fast, and designed to allow UBER to hire as many drivers as possible while incurring minimal associated costs. Such cost saving, however, is at the expense of riders, especially female riders. Specifically, at no time during the application process does UBER or its third-party background beck vendors do any of the following:

  a. conduct biometric fingerprint background checks of driver applicants;

  b. conduct in-person interviews of driver applicants;

  c. properly verify that Social Security numbers and other personal identification numbers submitted in the application process in fact belong to the driver applicants.

  d. engage in continuous criminal status monitoring of active drivers/employees; or

  e. require applicant or active drivers/employees to attend training classes to prevent harassment, including sexual harassment of customers.

16.     In 2015, in UBER's home state of California, the District Attorneys of San Francisco and Los Angeles filed a complaint alleging that individuals who passed UBER's security screening process and were found driving for UBER had the following felony convictions: second-degree murder; lewd and lascivious acts against a child under

the age of 14; sexual exploitation of children; kidnapping for ransom with a firearm; assault with a firearm; grand theft; robbery; identity theft; burglary; and taking a vehicle without consent. In connection with the litigation, the San Francisco District Attorney called the background checks without fingerprinting "completely worthless."

17.     UBER does not verify that the individual actually operating a vehicle is the individual registered as an UBER driver. Thus, even if applicants do not pass the UBER security screening process, it is still possible for such individuals to pick up UBER customers as ostensible UBER drivers. In other words, UBER does not ensure that the driver picking up an UBER customer is the registered UBER driver.

18.     As a result of UBER's deficient security screening, drivers who have been arrested, charged, and/or convicted of violent crimes, theft, armed robbery, DWI, driving with a suspended license, and multiple moving violations successfully register as UBER drivers and can and do get matched with UBER ride requests through the UBER app, exposing riders to dangerous and potentially violent situations without their knowledge.

19.     UBER does nothing to ensure that its drivers are not intoxicated or under the influence of drugs or medications causing cognitive impairment while transporting UBER customers.

20.     Hundreds if not thousands of crimes committed by UBER drivers against their riders were reported in the years 2015 and 2016, alone, ranging from theft to sexual assault, kidnapping, and rape. Due to general underreporting of sexual crimes, these media-reported assaults may represent only a small fraction of the number of actual sexual assaults that are perpetrated by UBER drivers against riders. UBER drivers have also been reported driving while intoxicated. Nonetheless, UBER advertises on its

website that "UBER is dedicated to keeping people safe on the road. Our technology enables us to focus on driver safety before, during, and after every trip."

21.     UBER particularly markets itself as a safer transportation alternative for women, exhibiting on its website pictures of smiling women entering and exiting vehicles who are meant to appear calm, content, and without fear for their safety.

22.     Riders, such as Plaintiff, reasonably rely upon UBER's representations and promises regarding its safety and security measures, including driver screening and background check procedures.

23.     Barely two weeks prior to the filing of the instant Complaint, the transportation authority for Greater London, England, United Kingdom, revoked UBER's license to operate, concluding that UBER's London subsidiary "is not fit and proper to hold a private hire operator license" due to the fact that UBER's "approach and conduct demonstrate a lack of corporate responsibility in relation to a number of issues which have potential public safety and security implications." Per London's transportation authority, these issues include UBER's "approach to reporting serious criminal offences" and its "approach to how Enhanced Disclosure and Barring Service (DBS) checks are obtained." DBS is the public body of the Home Office of the United Kingdom enabling organizations in the public, private, and voluntary sectors to conduct criminal background checks of employment candidates. The decision was a momentous one, because UBER is well-entrenched in London; it was one of the first cities in which UBER operated outside the U.S.

MICHAELS

24.     MICHAELS is a Florida resident who was the UBER driver/employee who battered and assaulted Plaintiff through unwanted and forcible touching and kissing. MICHAELS is at least partly legally responsible for the events and happenings herein referred to and caused Plaintiff to incur injuries and damages, as alleged herein.

## JURISDICTION AND VENUE

25.     This is an action for damages in excess of the sum of Fifteen Thousand Dollars ($15,000.00).

26.     The Court has personal jurisdiction over UBER because it was and is authorized to conduct and was in fact conducting business under the laws of the State of Florida. At all times material hereto, UBER, directly and through its agents, engaged in substantial, continuous, systematic, and non-isolated business in the State of Florida. It is subject to personal jurisdiction in the State of Florida because it regularly conducts business in the State of Florida.

27.     MICHAELS is a Florida resident who resides in Charlotte County.

28.     Plaintiff is a Florida resident who resides in Miami-Dade County.

## FACTUAL ALLEGATIONS

### Plaintiff is battered and assaulted by UBER driver MICHAELS

29.     As of March 29 - 30, 2016, Plaintiff was a full-time student at a university. During a brief break from studying, Plaintiff went out for a late dinner.

30.     Shortly before 1:00 a.m., Plaintiff summoned an UBER vehicle through her smartphone to transport her back to her apartment.

8

31.     UBER assigned Defendant MICHAELS as Plaintiff's UBER driver, and UBER's own invoice for the ride in question reflects that MICHAELS picked Plaintiff up at 12:55 a.m. Plaintiff sat in the rear, passenger-side seat.

32.     Plaintiff and MICHAELS had very limited conversation. MICHAELS asked Plaintiff to confirm her destination address, which she did.

33.     Due to MICHAELS' thick South Asian accent, out of curiosity, Plaintiff asked MICHAELS where he was from, and he responded.

34.     Plaintiff arrived at her destination at the end of the thirteen-(13)-minute ride.

35.     However, just as Plaintiff was about to exit MICHAELS' vehicle, MICHAELS turned around and lunged toward the back seat, where Plaintiff was seated, grabbed Plaintiff, and forcibly kissed her mouth.

36.     In absolute shock, humiliation, and distress, Plaintiff immediately went into her apartment and reported the incident to UBER.

37.     However, UBER's only proposed response was to refund Plaintiff's fare and remove MICHAELS' ability to be matched as *Plaintiff's* driver in the future (which would have happened anyway if Plaintiff had simply given him a poor rating). Incredibly, this means that UBER was continuing to allow MICHAELS to work as an UBER driver for other riders, including, potentially, unaccompanied female riders. As such, Plaintiff reported the incident to the local police department.

38.     The investigating officer, Detective Patricia Pena, initially informed Plaintiff that the situation would likely be a case of "her word against his." However, Det. Pena subsequently informed Plaintiff that during her interview of MICHAELS, he had

admitted to the incident. MICHAELS had apparently also advised Det. Pena that Plaintiff was "lucky he didn't have sex with her."

39.     Upon information and belief, MICHAELS was charged with assault and battery in Arlington Virginia General District Court Case No. GC16002520-00 in connection with the incident that gave rise to Plaintiff's Complaint herein.

### COUNT I – BATTERY (MICHAELS)

40.     Plaintiff alleges and reasserts Paragraphs 1 – 39 as if fully set forth herein.

41.     MICHAELS intended to physically touch Plaintiff upon her body, including but not limited to her mouth, forcefully, unlawfully, and without her consent.

42.     MICHAELS did in fact touch Plaintiff without her consent and against her will.

43.     MICHAELS' touching of Plaintiff without her consent and against her will was offensive to Plaintiff.

44.     As a direct and proximate result of the aforementioned unwanted and offensive physical contact at the hands of MICHAELS, Plaintiff suffered violation of her person, pain and suffering, mental anguish, loss of enjoyment of life, anxiety, humiliation, depression, loss of dignity, and emotional distress.

### COUNT II – ASSAULT (MICHAELS)

45.     Plaintiff alleges and reasserts Paragraphs 1 – 39 as if fully set forth herein.

46.     MICHAELS intended to physically touch Plaintiff upon her body, including but not limited to her mouth, forcefully, unlawfully, and without her consent.

47.     MICHAELS demonstrated the apparent ability to carry out his intention to physically touch Plaintiff upon her body, including but not limited to her mouth, forcefully, unlawfully, and without her consent.

48.     MICHAELS' conduct created in Plaintiff a well-founded fear that the intended physical touching of Plaintiff upon her body, including but not limited to her mouth, forcefully, unlawfully, and without her consent, was imminent.

49.     As a direct and proximate result of the aforementioned fear of imminent unwanted and offensive physical contact at the hands of MICHAELS, Plaintiff suffered violation of her person, pain and suffering, mental anguish, loss of enjoyment of life, anxiety, humiliation, depression, loss of dignity, and emotional distress.

## COUNT III – VICARIOUS LIABILITY (UBER)

50.     Plaintiff alleges and reasserts Paragraphs 1 – 39 as if fully set forth herein.

51.     At all times material, UBER was and is a common carrier that employed MICHAELS. MICHAELS was under UBER's direct supervision, employ, and control when he committed the wrongful acts described herein. MICHAEL engaged in this conduct while acting in the course and scope of his employment with UBER and/or accomplished the battery by virtue of his job-created access and apparent authority.

52.     UBER granted MICHAELS authority to perform as an UBER agent within the UBER driver network. UBER held MICHAELS out to the community as a fit and competent agent of UBER, and MICHAELS committed the acts alleged within the apparent authority arising from his agency. Said conduct was undertaken in the course and scope of MICHAELS' employment with UBER.

53.     MICHAELS was acting at least in part to serve the interests of his employer when he committed the battery. Specifically, MICHAELS was acting as an agent, as well as using the trust, power, and authority of the position granted, while he was with Plaintiff. Simultaneously, MICHAELS used the same power and authority to gain Plaintiff's confidence and trust and to commit a battery upon her.

54.     By using his position of trust, power, and authority of the position conferred on him, MICHAELS purported to act and/or speak on behalf of UBER when he committed the tortious act alleged. Plaintiff further relief upon MICHAELS' apparent authority to act on behalf of UBER when she, inter alia, accepted MICHAELS' offer to provide her with transportation.

55.     The battery of an unaccompanied female passenger by an UBER driver was a foreseeable and well-known hazard to UBER.

56.     MICHAELS conducted his tortious conduct during his agency relationship with UBER while actually providing transportation services to Plaintiff. As a common carrier, UBER is liable for the intentional wrongful conduct of MICHAELS under the law of vicarious liability, including the doctrine of respondeat superior.

57.     As a direct and proximate result of the aforementioned unwanted and offensive physical contact at the hands of MICHAELS and Plaintiff's fear that same would be imminent, Plaintiff suffered violation of her person, pain and suffering, mental anguish, loss of enjoyment of life, anxiety, humiliation, depression, loss of dignity, and emotional distress.

## COUNT IV – NEGLIGENT HIRING (UBER)

58.     Plaintiff alleges and reasserts Paragraphs 1 – 39 as if fully set forth herein.

59.     UBER had a duty to exercise reasonable care to Plaintiff and the general public in its pre-hiring investigation of MICHAELS, before UBER decided to hire him to transport UBER passengers, including unaccompanied female passengers.

60.     UBER breached its duty of care to Plaintiff in one or more of the following ways:

a. Failing to conduct an adequate inquiry as to whether it was safe to place MICHAELS in a position to drive for UBER, knowing that he would have contact with female passengers;

b. Failing to adequately inquire into MICHAELS' past employment background;

c. Failing to contact MICHAELS' references;

d. Failing to have a sufficiently adequate background check performed;

e. Failing to conduct biometric fingerprint background checks of driver applicants, such as MICHAELS;

f. Failing to conduct in-person interviews of driver applicants, such as MICHAELS;

g. Failing to properly verify that Social Security numbers and other personal identification numbers submitted in the application process in fact belong to the driver applicants, such as MICHAELS.

h. Failing to engage in continuous criminal status monitoring of active drivers/employees, such as MICHAELS;

i. Failing to require applicant or active drivers/employees, such as MICHAELS, to attend training classes to prevent harassment, including sexual harassment of customers; and

j. Additional acts of negligence not yet discovered.

61.     As a direct and proximate result of the aforementioned negligence of UBER, Plaintiff suffered unwanted physical contact at the hands of MICHAELS,

violation of her person, pain and suffering, mental anguish, loss of enjoyment of life, anxiety, humiliation, depression, loss of dignity, and emotional distress.

### COUNT V – NEGLIGENT RETENTION (UBER)

62.    Plaintiff alleges and reasserts Paragraphs 1 – 39 as if fully set forth herein.

63.    UBER had a duty to exercise reasonable care in its retention of MICHAELS as an UBER driver transporting UBER passengers, including unaccompanied female passengers.

64.    UBER breached its duty by retaining MICHAELS, despite receiving either actual or constructive knowledge of MICHAELS' unfitness to transport the general public, including Plaintiff, during the course of his employment.

65.    UBER breached its duty when it failed to further investigate and/or discharge MICHAELS prior to the subject incident.

66.    As a direct and proximate result of the aforementioned negligence of UBER, Plaintiff suffered unwanted physical contact at the hands of MICHAELS, violation of her person, pain and suffering, mental anguish, loss of enjoyment of life, anxiety, humiliation, depression, loss of dignity, and emotional distress.

### COUNT VI – NEGLIGENT SUPERVISION (UBER)

67.    Plaintiff alleges and reasserts Paragraphs 1 – 39 as if fully set forth herein.

68.    At all times material hereto, MICHAELS was employed by, and/or was an agent of UBER. MICHAELS was under UBER's direct supervision, employ, and control when he committed the wrongful acts alleged herein. The damages suffered by Plaintiff

were brought about as a direct and proximate result of the employment by UBER of MICHAELS, while MICHAELS was transporting Plaintiff as an UBER driver.

69.     UBER had a duty to supervise MICHAELS and to take reasonable measures to know of his actions while transporting members of the general public, including Plaintiff, on behalf of UBER.

70.     UBER breached its duty by failing to properly supervise or exercise reasonable care in supervising MICHAELS on the night that he battered Plaintiff.

71.     UBER failed to prevent the reasonably foreseeable misconduct of MICHAELS from causing harm to others.

72.     As a direct and proximate result of the aforementioned negligence of UBER, Plaintiff suffered unwanted physical contact at the hands of MICHAELS, violation of her person, pain and suffering, mental anguish, loss of enjoyment of life, anxiety, humiliation, depression, loss of dignity, and emotional distress.

## DEMAND FOR JURY TRIAL

Plaintiff, SUMMER TILLMAN, demands a trial by jury of all issues so triable.

DATED this 25 th day of October, 2017.

> THE LAW OFFICES OF ROBERT DIXON  Attorney for the Plaintiff
> 5963 Biscayne Blvd.,
> Miami, Florida 33137
> (305) 917-1111 phone
> (305) 917-1112 facsimile
> Litigation@flaccidentattorney.com
> David@flaccidentattorney.com
>
> By: /s/ Robert Dixon
>     Robert Dixon, Esq.
>     Fla. Bar No.: 0021608